```
                      UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF KENTUCKY
                      CENTRAL DIVISION at LEXINGTON
```

STEVE DUNN,                        )
                                   )
     Plaintiff,                    )
                                   )          Civil Case No.
v.                                 )          5:13-cv-8-JMH-REW
                                   )
CORNING INCORPORATED,              )          **MEMORANDUM OPINION**
                                   )              **AND ORDER**
     Defendant.                    )
                                   )

                                *** 

This matter is before the Court upon Defendant's Motion for Summary Judgment. [D.E. 25]. Defendant filed a Supplemental Memorandum [D.E. 34], as ordered by the Court, and Plaintiff filed a Supplemental Response. [D.E. 37]. This matter being fully briefed, and the Court being otherwise sufficiently advised, it is now ripe for the Court's review.

**I. Factual and Procedural Background**

This suit was removed to this Court from the Circuit Court of Mercer County, Kentucky, on the basis of diversity jurisdiction, pursuant to 28 U.S.C. § 1441. [D.E. 1]. Plaintiff asserts claims of negligence per se and negligence, seeking compensatory and punitive damages for injuries he sustained while working at Defendant's Harrodsburg, Kentucky manufacturing plant. [D.E. 1-1]. Plaintiff's employer, Comstock Brothers Electric Company, LLC, was hired as an independent contractor by Defendant to perform electrical work at its manufacturing plant

for the 2012 calendar year. [D.E. 25-4, 25-5]. While working for Comstock Brothers at Defendant's manufacturing plant, Plaintiff was injured when he was struck in the head. [D.E. 28, at 2]. Plaintiff was attempting to exit the cullet crusher pit at Defendant's plant when the exit hatch swung back and hit him in the head, causing Plaintiff to fall down the ladder and into the cullet crusher pit. *Id.*

Defendant filed a Motion for Summary Judgment [D.E. 25] claiming that it is entitled to the exclusive remedy protection of the Kentucky Workers' Compensation Act. There is no dispute that Comstock Brothers and Corning Incorporated were each covered by workers' compensation insurance policies at the time of Plaintiff's injuries. [D.E. 25-7; 25-8]. After the briefing period for Defendant's Motion for Summary Judgment, the Court allowed additional time for discovery and ordered the parties to file supplemental memorandums on the limited issue of the regularity or recurring nature of running electrical power within Defendant Corning Incorporated's business. [D.E. 32].

**II. Standard of Review**

A motion for summary judgment may only be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "On summary judgment the inferences to be

2

drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**III. Analysis**

The evidence establishes that running electrical power was a regular or recurring task within Defendant's business. Therefore, Defendant is entitled to the exclusive remedy protection provided by the Kentucky Workers' Compensation Act, and summary judgment is appropriate. The exclusiveness of recovery under the Kentucky Workers' Compensation Act is established by KRS 342.690:

> If an employer secures payment of compensation as required by this chapter, the liability of such employer under this chapter shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death. For purposes of this section, the term "employer" shall include a "contractor" covered by subsection (2) of KRS 342.610.

KRS 342.690(1). A contractor is defined as "[a] person who contracts with another . . . to have work performed of a kind which is a regular or recurrent part of the work of the trade, business, occupation, or profession of such person." KRS 342.610(2). "Recurrent simply means occurring again or repeatedly. Regular generally means customary or normal, or happening at fixed intervals. However, neither term requires regularity or recurrence with the preciseness of a clock or calendar." *Daniels v. Louisville Gas & Elec. Co.*, 933 S.W.2d 821, 824 (Ky. Ct. App. 1996).

Kentucky courts determine whether the work being performed by an injured plaintiff was regular or recurrent by assessing the regularity of the particular task being performed when injured. In *General Electric Co. v. Cain*, the Kentucky Supreme Court analyzed the individual tasks a plaintiff, Rehm, performed for each of the multiple defendants. 236 S.W.3d 579, 592-605 (Ky. 2007). Likewise, the Kentucky Court of Appeals, when assessing whether an electrical cooperative was a contractor, focused on the individual task of "repairing a power line." *Reichwein v. Jackson Purchase Energy Corp.*, 397 S.W.3d 413, 418 (Ky. Ct. App. 2012). Thus, Defendant can only be considered a "contractor" for purposes of the exclusive remedy protection if the particular task being performed by Plaintiff was a regular

4

or recurrent task performed by Defendant's employees or independent contractors. *See Doctors' Assocs. v. Uninsured Employers' Fund*, 364 S.W.3d 88, 92 (Ky. 2011) ("A contractor that never performs a particular job with its own employees can still come within KRS 342.610(2)(b).").

Analyzing the facts in the light most favorable to Plaintiff, the evidence establishes that running electrical power was a regular or recurring part of Defendant's business. As the Court noted in its previous Order, it is undisputed that Plaintiff was injured while running electrical power to the cullet crusher pit. [D.E. 32 at 4-5]. However, the Court ordered additional discovery and supplemental memorandums because the Court found that neither party had adequately addressed the question of whether Plaintiff's particular task, running electrical power, was a regular or recurring part of Defendant's business. [D.E. 32 at 4].

Supplemental discovery establishes that running electrical power is a regular or recurring, if not daily, activity within Defendant's business. Clifton G. Ross, the head of maintenance at Defendant's Harrodsburg plant, stated in a supplemental affidavit[1] that running electrical power "was a basic task

---

[1] Plaintiff asserts that the Court should not rely on the supplemental affidavit from Ross because Plaintiff did not have

5

performed daily by the electricians at the Corning facility during the time that I held the position of Electrical Supervisor, whether rebuilds or expansion projects were in progress or not." [D.E. 34-1 at 1]. He further stated that "Corning electricians are routinely called upon to run conduit and wire multiple times a week in the normal operation of the plant." *Id.* Importantly, Ross stated that "[t]he work of running conduit and/or running electrical power being performed by Steve Dunn in the cullet crusher pit, is the same type of work performed daily by the Corning electricians as part of the normal plant operations." *Id.* at 3.

Mark Hewlett, the current electrical supervisor of Defendant's Harrodsburg plant, was deposed during the additional time given for discovery. Hewlett was not employed by Defendant at the time Plaintiff was injured. [D.E. 34-3 at 8]. Hewlett testified that "it's a very frequent task for us to have to conduit, but not as much as a complete [sic] entirely new rebuild, similar to what 136 and 137 was or Weigh/Mix 3. Those were completely basically brand new installation and you're

---

a chance to question Ross on the issues contained in the affidavit. However, the Court opened the additional discovery period to both parties. [D.E. 32 at 7-8]. If Plaintiff wished to question Mr. Ross further on the limited issue specified in the Court's previous order, he was free to seek leave from the Court to do so. *See* Fed. R. Civ. P. 30.

wiring everything from scratch. So that's a lot more pipe and wire than would normally be on a regular rebuild." [D.E. 34-3 at 5-6]. In regard to running conduit, Mr. Hewlett further testified:

> Q: And how frequently do the Corning electricians run power or run conduit?
> A: Almost every day. Almost every day I've got someone running conduit or pulling wire.

[D.E. 34-3 at 5]. . . .

> Q: We talked about conduit. I mean, does Corning use a lot of conduit?
> A: Yes. We use thousands of feet a year, multiple thousands of feet a year of conduit.

[D.E. 34-3 at 6]. . . .

> Q: And is all of the conduit used there at the Corning facility put in by the electricians?
> A: Yes. Either our electricians or our contract electricians, yes. [D.E. 34-3 at 6].

Finally:

> Q: Within the last week that you've held these meetings, have you had assignments to run conduit?
> A: Yes.
> Q: Even though no rebuild project is going on?
> A: Yes. We run conduit every week and almost every day.

[D.E. 34-3 at 8]. This evidence firmly establishes that the type of work Plaintiff was performing when injured was a regular or recurrent part of Defendant's business.

Plaintiff claims that he was not working on a regular or recurrent part of Defendant's business "because (1) of the magnitude of the electrical work required by such an expansion project and (2) the expansion project required work with high

7

voltages which Corning's electricians were unable to do." [D.E. 37 at 2].

Plaintiff is correct that the work he was completing when injured was necessitated by a large-scale expansion project. However, the evidence shows that the actual work being performed was no different than the work that is performed at the plant on a daily basis. Clifton Ross testified in his deposition:

> Q: But it was part – but his work there was to aid in the construction of Weigh/Mix 3.
> A: Yes.
> Q: And you had to – I assume that you had to tie in electrical from there to the Weigh/Mix 3 project.
> A: Yes. He –
> Q: Okay.
> A: He was running – running electrical power.

[D.E. 25-2 at 14]. The evidence shows, and there has been no dispute, that Plaintiff was running electrical power, which, based on the evidence previously identified, was performed almost daily at the Harrodsburg plant.

Plaintiff first claims this was not regular or recurring work because Clifton Ross testified that the regular employees of Defendant could not handle the scope of the project. [D.E. 37 at 4]. Ross did make that statement, but not because the project required work not typically performed by Corning employees. Rather, the amount of the regular or recurring work was simply so abundant that the project could not be completed in a timely

8

fashion without the manpower provided by outside contractors.

Mr. Ross testified to the following:

> Q: Now, was Mr. Dunn – why would Corning – Corning had electricians, correct?
> A: That's correct.
> Q: Were their electricians capable of doing the work that Mr. Dunn was doing?
> A: Yes.
> Q: Why did Corning get – bring in Mr. Dunn's employer, his company to do the work?
> A: Our work is cyclical.
> Q: Right.
> A: We – we have upswings and downswings. When – when we have an increase in workload or a surge, we bring in – we contract with different companies, local companies to bring in electricians to work with our – our crew to – to perform the work. Basic – basically we can't have a shop big enough to perform the surge work and then have people sitting around in the downtimes.

[D.E. 25-2 at 12-13].

Mr. Hewlett, the current electrical supervisor, also testified to the cyclical nature of the work typically performed by Corning electricians.

> Q: And is there some sort of ebb and flow to the work of the electricians?
> A: Yes.
> Q: Are there time periods where they are busier?
> A: Yes. We have rebuilds on all of our lines. Usually a production line will go three to five years and then it will require to be refurbished. And we oversee that and do a lot of the work, but we have to bring in a fairly large contract labor force when we do the rebuilds. Also we do a lot of project work, different types of project work, outside of rebuild activities. So we're either doing project work or rebuild most of the year.

[D.E. 34-3 at 3]. Thus, the testimony shows that the work Mr. Dunn was performing was not outside the expertise or typical duties of Corning employees. Plaintiff was performing work that, but for the demand for electrical work at the Harrodsburg plant, would have been performed by Corning employees. The testimony also establishes that not only was running electrical power a regular or recurring part of Defendant's business, but hiring outside contractors to perform the task was a regular or recurring part of Defendant's business.

Plaintiff relies on the testimony of Mark Hewlett, Corning's electrical supervisor, for the proposition that the large expansions were unique "because you are wiring everything from scratch" [D.E. 37 at 4] (quoting [D.E. 34-3 at 5-6]), and that necessitates more wire. [D.E. 34-3 at 5-6] ("[T]hat's a lot more . . . wire than would normally be on a regular rebuild."). However, the running of electric power always includes wire. *See* [D.E. 34-1 at 1] ("Corning electricians are routinely called upon to run conduit and *wire* multiple times a week in the normal operation of the plant.") (emphasis added); [D.E. 34-3 at 5] ("Running conduit is something that all electricians do. I mean, that's one of their primary goals is to get conduit and wiring from point A to point B."). Furthermore, Hewlett testified that "there's nothing unique about the task of running conduit. . . .

10

Running conduit and pulling wire through conduit, like I said before, is a similar process no matter where you're doing it."[2] [D.E. 34-3 at 6]. Thus, Hewlett's testimony establishes that the electrical work being performed by Plaintiff was not a type of work that would have been out of the ordinary, despite the fact that it was necessitated by an expansion project.

Plaintiff also claims that the work was not regular or recurring because Comstock was brought in to work on high voltage lines. [D.E. 37 at 7]. The evidence does not support this contention. Plaintiff relies on the deposition of Mr. Hewlett for the proposition that Plaintiff's employer was hired to work on high voltage lines. [D.E. 37 at 6-7]. However, Plaintiff fails to include the testimony from Mr. Hewlett where he indicated that Mr. Ross was the most knowledgeable as to which contractor was hired to perform which part of the project, and that he would defer to Ross if Ross stated that a contractor other than Comstock was working on the main power feed. [D.E. 34-3 at 10]. Mr. Ross previously stated in his deposition:

> A: It – on Weigh/Mix 3 for the electrical portion which Steve was working on, we did most of the

---

[2] The Court takes note of Plaintiff's hearsay objection to this testimony given by Hewlett. However, as the current electrical supervisor, Mr. Hewlett's testimony is based upon his personal knowledge of the task of running conduit and the tasks Defendant's electricians perform on a daily basis.

> electric for that project. The only part of the project that we did not do was the main power feed –
> Q: Okay.
> A: -- to the new facility.
> Q: So you brought in an outside contractor, Comstock, his employer, or others?
> A: We brought in – we brought in Ready Electric –
> Q: Okay.
> A: -- to install the – the main power feed for the –
> Q: Okay.
> A: -- for the Weigh/Mix 3 expansion.
> Q: That's what Mr. Dunn was working on.
> A: No. Mr. Dunn was working in the cullet crushing area.

[D.E. 25-2 at 13]. Thus, the most knowledgeable person, according to Mr. Hewlett, has offered testimony that Plaintiff was not working on high voltage electrical lines. Instead, that work was being performed by another contractor that did not employ Plaintiff. Thus, the evidence shows that Plaintiff was performing a task that was a regular or recurring part of Defendant's business. Plaintiff's arguments that the magnitude of the work was greater than normal and that the work involved high voltage lines are without merit, and Defendant is entitled to the exclusive remedy protection of the Kentucky Workers' Compensation Act.

**V. Conclusion**

Accordingly, for the foregoing reasons, **IT IS ORDERED:**

(1) that Defendant's Motion for Summary Judgment [D.E. 25] be, and the same hereby is, **GRANTED**;

(2) that Plaintiff's claims be, and the same hereby are, **DISMISSED WITH PREJUDICE.**

This the 22nd day of November, 2013.



Signed By:
*Joseph M. Hood*
Senior U.S. District Judge